TEXACO, INC., Plaintiff,

v.

INGRAM BARGE COMPANY, Defendant.

No. 76–412C(2).

United States District Court, E. D. Missouri, E. D.

Nov. 5, 1976.

P. Terence Crebs, Clayton, Mo., for plaintiff.

Fritz Faerber, St. Louis, Mo., for defendant.

## MEMORANDUM OPINION

REGAN, District Judge.

This is an action in admiralty whereby damages are sought for alleged breach of a contract of bailment. Count I of the amended complaint alleges that as bailee, defendant undertook to transport via the inland waterways two grades of plaintiff's gasoline and that when the gasoline was thereafter delivered to plaintiff, the higher grade of gasoline was in a damaged and depreciated condition by reason of having been commingled with the lower grade fuel. Count II makes the same allegations with the added charge that the alleged commingling directly resulted from defendant's breach of the Voyage Charter Agreement between the parties.

On May 8, 1974, pursuant to plaintiff's order, defendant tied off its barge Memphis in position to be loaded at plaintiff's Mt. Vernon, Illinois facility. The barge is com-

partmental with six port and six starboard compartments.

Employees of plaintiff then boarded the barge, inspected her valves and compartments (which they found to be dry), set her loading compartment valves and the valves on shore in the position they desired, connected and placed the hoses which were to be employed in the loading process, and (according to gauge readings taken by plaintiff's personnel from plaintiff's shore tanks) pumped into the barge a total of 1,083,054 gallons of gasoline at 62° F. for the transport to plaintiff's Louisville, Kentucky, terminal facility. Of this total 765,-870 gallons were "Fire Chief," a regular grade gasoline whose normal octane rating is 90.0 and 317,184 gallons were "Sky Chief," a premium grade gasoline whose normal octane rating is 96.0. Fire Chief (colored orange by the introduction of dye) was loaded into port and starboard compartments 1, 2, 3 and 4, and Sky Chief (colored red) was loaded into port and starboard compartments 5 and 6.

The loading of compartments 5 and 6 was accomplished first, following which compartments 1, 2, 3 and 4 were loaded by different personnel of plaintiff, the earlier shift having gone off duty. The loading process was accomplished through the use of two hoses, one from each of plaintiff's shore tanks, which were joined together at a "Y" connection forming a single loading hose which was used to load the barge. Plaintiff's personnel who engaged in the loading process testified that a failure to properly set and adjust valves at the junction of the two hoses into a single hose would result in product from one shore tank being pumped into compartments of the barge which were to have received product from the other shore tank.

Upon completion of loading, plaintiff's personnel gauged the twelve compartments of the barge by using a pole to determine the amount of product, by depth in the compartments, in each compartment. The gasoline in each compartment was then "sampled" by plaintiff's personnel, the sampling consisting of taking pint samples from each compartment and visually inspecting each sample. However, plaintiff adduced no testimony covering the results of the sampling, nor any evidence as to any laboratory or other chemical analysis having been made of the gasoline prior to the loading or of the samples after loading was completed.

Following the loading process, defendant's barge Memphis was made part of a tow and moved to plaintiff's Louisville, Kentucky terminal facility for unloading. Upon arrival in Louisville on May 10, 1974, the barge was positioned for unloading by defendant at plaintiff's facility and tied off. Employees of plaintiff then boarded the vessel and gauged her tanks. This gauging revealed only insignificant discrepancies in product depth in each compartment when compared to Mt. Vernon gauging results. This indicates, as plaintiff's employee testified, that there had been no grounding of the barge and that the barge had not been involved in a collision. An inspection of the barge's compartments and her valves and discharge header was then performed by plaintiff's employees. Plaintiff's Assistant Terminal Superintendent Richard E. Smith testified that the discharge apparatus was found to be satisfactory. He also testified that the port and starboard compartments 5 and 6 contained red petroleum products and the port and starboard compartments 1, 2, 3, and 4 contained orange petroleum products.

Defendant's tankerman, Ed Lewis, had previously connected a discharge hose of approximately 20–30 feet in length to the discharge header located at the stern of defendant's barge. All other hoses employed in the unloading process belonged to and were connected by plaintiff's employees. Plaintiff's employees connected plaintiff's hoses to the defendant's discharge hose. Upon command from plaintiff's employees, defendant's tankerman Lewis activated the pump aboard the barge and the unloading process from the barge to plaintiff's shore tanks began, beginning with the bow compartments and working back to the stern of the barge as consecutive bow com-

partments were emptied. The unloading process was completed at 8:30 A.M. on May 11, 1974.

At the time of the commencement of the unloading process, plaintiff's "Sky Chief" shore tank contained 15,316 gallons of product. The quality and composition of this product is unknown as there was no evidence adduced at trial that samples from the "Sky Chief" shore tank had been subjected to laboratory analysis. During the unloading of port and starboard compartments 5 and 6, some 47,356 gallons of petroleum product were simultaneously being discharged from plaintiff's "Sky Chief" shore tank into trucks.

Shortly after the completion of the unloading of defendant's barge, Superintendent Smith calculated, by use of gauges on plaintiff's shore tanks, that plaintiff's "Fire Chief" shore tank had received 724,864 gallons of product, at 60° F., and plaintiff's "Sky Chief" shore tank had received 384,584 gallons of product. These calculations, if correct, indicate a shortage in discharge of some 41,000 gallons of "Fire Chief" and a surplus of some 67,000 gallons of "Sky Chief." They also, of course, indicate an overall discharge surplus of more than 26,000 gallons. When Smith was unable to reconcile this discrepancy he issued a "stop order" on the product in plaintiff's "Sky Chief" shore tank on May 13, 1974. The storage tank at that time contained 224,000 gallons of product. A sample was taken of the product in that shore tank, and analysis by plaintiff's chemists indicated that the product in the tank had an octane rating of 94.5. Plaintiff's chemist George Corey testified that the sample so tested for octane rating was red, and was visually indistinguishable from Sky Chief gasoline with a 96.0 octane rating. These 224,000 gallons of product were sold as "Fire Chief" at 3 cents less per gallon than the normal price of "Sky Chief." The parties orally stipulated, at trial, that the difference in value to plaintiff between "Sky Chief" and "Fire Chief" at the time material hereto was three cents per gallon.

On May 13, 1974, plaintiff shipped aboard the same barge "Fire Chief" and "Fuel Chief," a fuel oil on the same geographical voyage as was undertaken in the present action. "Fire Chief" and "Fuel Chief" are incompatible petroleum products. To date, there has been no complaint by plaintiff that these two products were commingled while aboard the Memphis on the May 13, 1974 voyage.

The Voyage Charter Agreement, which set forth the conditions under which defendant agreed to provide the barge for transportation of liquid petroleum and liquid petroleum products, provided inter alia in Provisions 1(A) and 9(B) as follows:

1. (A) "Owner [defendant] shall, before and at the beginning of each voyage, exercise due diligence to make each Vessel seaworthy, properly manned, equipped and supplied for the voyage and to make the cargo tanks, pipelines, and valves of each Vessel suitable for the intended cargo and its pumps and heating coils, if any, in good working condition and shall exercise due diligence to maintain such condition and shall use reasonable care in the loading, stowage, custody, care and delivery of the cargo."

9. (B) "Owner shall not be responsible for any admixture of two or more descriptions of cargo nor for leakage, contamination or deterioration in the quality of the cargo unless such admixture, leakage, contamination or deterioration is caused by: (1) unseaworthiness resulting from failure of Owner to exercise due diligence: or (2) caused by fault of Owner or his servants in the loading, care or discharge of the cargo."

There is no substantial evidence that the barge was unseaworthy nor that defendant failed to use due diligence to furnish a seaworthy vessel. As noted supra, the barge was inspected and found satisfactory by plaintiff's employees both prior to loading and prior to discharging the gasoline. In addition, the later shipment of incompatible liquid petroleum products without

commingling supports our findings of seaworthiness. Plaintiff does not contend otherwise. It is plaintiff's theory that we should draw the inference that defendant breached either its common-law or contractual duty of exercising reasonable care to redeliver the gasoline in the condition in which it came into defendant's exclusive care, custody and control upon a showing that the two grades of gasoline were properly loaded aboard the barge but were found to be in a damaged and depreciated condition upon discharge.

The difficulty with plaintiff's position is the paucity of evidence to warrant us in drawing the inference. The basic premise of plaintiff is that we must assume, without testimonial evidence, that the 317,184 gallons loaded into compartments 5 and 6 in fact had an octane rating of 96.0 merely because they were loaded from shore tanks which were used to store Sky Chief gasoline. True, that gasoline was colored red, but so too was the gasoline which was found to have an octane rating of 94.5. Absent testimonial evidence of any chemical tests or other substantial proof of the actual octane rating of the purported Sky Chief gasoline as of the time it was loaded into the barge, we hold that in light of the evidence as a whole plaintiff failed to sustain its burden of proving that such gasoline had an octane rating of 96.0. In addition, there were some 15,000 gallons of gasoline in the Sky Chief shore tank into which defendant redelivered the gasoline. Again under plaintiff's premise, we must assume, without testimony concerning any chemical or other tests, that this gasoline was in fact Sky Chief with an octane rating of 96.0.

Complicating and confusing the issues is the unexplained fact that according to plaintiff's calculations, by the use of its gauges on plaintiff's shore tanks at Louisville, the total gallonage unloaded into the shore tanks was some 26,000 gallons in excess of the quantity plaintiff had pumped into the dry barge compartments. We are not advised as to the disposition of the excess gallonage, although we may reasonably assume that plaintiff sold it at its regular price without crediting defendant with the proceeds.

Upon a consideration of the evidence as a whole, we are convinced and so find that plaintiff has not sustained its burden of establishing that defendant breached any duty owing by it to plaintiff either under the law of bailment or under the Voyage Charter Agreement.

Accordingly, judgment will be entered in favor of defendant and against plaintiff.

The foregoing memorandum opinion constitutes our findings of fact and conclusions of law.